IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIC T. ALSTON,

                Plaintiff,

      v.

THE CITY OF MADISON, NOBLE WRAY,
TOM WOODMANSEE, CORY NELSON,
SAMANTHA KELLOGG, PAIGE VALENTA
and BRIAN REYNOLDS,

                Defendants.[1]

OPINION and ORDER

13-cv-635-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Eric Alston is proceeding on two claims: (1) defendant Brian Reynolds (plaintiff's former probation agent) issued an apprehension request for plaintiff without reasonable suspicion of wrongdoing, in violation of the Fourth Amendment; and (2) defendants Noble Wray (former chief of police for the Madison Police Department), Tom Woodmansee (a police lieutenant), Cory Nelson (also a police lieutenant), Samantha Kellogg (a police detective), Paige Valenta (a police sergeant) and the City of Madison placed plaintiff in the "Focused Deterrence" program because of his race and without an opportunity to be heard, in violation of the equal protection clause and the due process clause.

---

[1] The parties stipulated to the dismissal of Kathryn Dayton, dkt. #105, so I have omitted her from the caption.

Now before the court is a second round of motions for summary judgment filed by defendant Reynolds, dkt. #95, and the remaining defendants, dkt. #100. I denied the first round without prejudice after concluding that the complexity of the case exceeded plaintiff's abilities to litigate, dkt. #77, and appointed counsel to represent plaintiff. Dkt. #78. Having reviewed the parties' renewed submissions, I am persuaded that no reasonable jury could find in plaintiff's favor on any of his claims. Accordingly, I am granting both motions for summary judgment.

OPINION

A. <u>Fourth Amendment Claim against Defendant Reynolds</u>

Plaintiff's sole claim against defendant Reynolds is that Reynolds (plaintiff's "Probation/Parole Agent," Dfts.' PFOF ¶ 11, dkt. #118) violated plaintiff's Fourth Amendment right to be free from unreasonable seizures by issuing an apprehension request for plaintiff, which led to plaintiff's being taken into police custody on December 6, 2011. An apprehension request is a warrant sent to law enforcement after an offender on supervision violates the conditions of his supervision; if the offender has other police contact, the request informs the police that they should place him in custody. Dfts.' PFOF ¶ 45, dkt. #118. The parties agree that the request was lawful under the Fourth Amendment if Reynolds had reasonable suspicion that plaintiff had violated the law or his terms of supervision. <u>Knox v. Smith</u>, 342 F.3d 651, 657 (7th Cir. 2003).

Defendant Reynolds says that he issued the apprehension request because plaintiff

2

missed a scheduled home visit on November 16, 2011; plaintiff's roommate told Reynolds that plaintiff would be moving; Reynolds was unable to reach plaintiff over the telephone for more than a week; and plaintiff did not leave contact information.  Dfts.' PFOF ¶ 34-44, dkt. #118.  Reynolds says that plaintiff's conduct violated Rule No. 16 of his rules of supervision ("You shall report to your agent as directed for scheduled and unscheduled appointments.") and Rule No. 4 ("You shall inform your agent of your whereabouts and activities as he/she directs.").  Dfts.' PFOF ¶ 39, dkt. #118; Reynolds Dec., exh. 101, dkt. #99.

Plaintiff challenges all of defendant Reynolds's reasons, but I need consider only one of them, which is plaintiff's failure to appear at the November 16, 2011 home visit.  Plaintiff does not deny that he missed a home visit that was scheduled for November 16, 2011, or that his failure to appear would violate his rules of supervision and provide grounds for issuing the apprehension request.  Instead, plaintiff says in his brief that "he knew he was going to be late for the home visit due to various tests he was taking at the Madison Area Technical College," so he "contacted defendant Reynolds to reschedule."  Dkt. #106 at 5. However, in the sworn statement that plaintiff cites to support this allegation, he admits that he did not reschedule the visit until *after* he missed the appointment.  Dkt. #71 at 3, ¶ 7 ("Plaintiff Alston recalls rescheduling the office visit just minutes after missing the November 16, 2011 'home visit.'").

Plaintiff does not acknowledge the discrepancy between his brief and the sworn statement.  Presumably, he believes that defendant Reynolds lost the authority to issue the

apprehension request after allegedly agreeing to reschedule the visit, but if that is plaintiff's belief, he does not provide a basis for it. According to defendant Reynolds, plaintiff did not call to reschedule the visit until November 30, 2011, Dfts.' PFOF ¶ 52, dkt. #118, well after Reynolds issued the apprehension request on November 23, 2011, id. at ¶ 44. Even if I assume that plaintiff called Reynolds "minutes" after he missed the visit, that does not change the fact that plaintiff *did* miss the visit and, therefore, violated the terms of his supervised release, which means that Reynolds had reasonable suspicion to issue an apprehension request.

Plaintiff does not cite any authority for the view that Reynolds would be estopped from issuing an apprehension request under the circumstances of this case. Whether Reynolds changed his mind or even lied to plaintiff about allowing him to schedule a new appointment is irrelevant under the Fourth Amendment. Scherr v. City of Chicago, 757 F.3d 593, 597 (7th Cir. 2014) ("[A] police officer's motive in applying for a warrant does not invalidate the warrant."). If it is true that plaintiff tried to reschedule his appointment only a few minutes after he missed it, that is a strong argument that Reynolds should have exercised his discretion and given plaintiff another chance, but that is not the test under the Fourth Amendment. Because it is undisputed that plaintiff violated his rules of supervision, defendant Reynolds had grounds for issuing the apprehension request and he is entitled to summary judgment.

In any event, even if I assume that Reynolds did not have grounds to issue the apprehension request on November 23, 2011, it is undisputed that plaintiff missed the

December 2, 2011 appointment as well, Dfts.' PFOF ¶ 53, dkt. #118; Plt.'s Resp to Dfts.' PFOF ¶ 53, dkt. #118, which provided grounds for taking plaintiff into custody.  (Plaintiff was suspected of committing a domestic battery at that time as well, Dfts.' PFOF ¶ 55, dkt. #118, but defendants do not rely on that issue as providing grounds for arresting plaintiff, so I do not consider it.)  Plaintiff argues that his failure to appear on December 2 is irrelevant because the question is whether the November 23 request was valid and plaintiff's later failure to appear "cannot retroactively serve as the basis for the prior issuance."  Plt.'s Br., dkt. #106, at 7.

Plaintiff's argument is misguided.  Defendant Reynolds's decision to issue an apprehension request was not itself a "seizure" under the Fourth Amendment so long as plaintiff evaded arrest.  United States v. Griffin, 652 F.3d 793, 798 (7th Cir. 2011) ("[A]n officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority.").  Plaintiff was not taken into custody until four days after he missed the December 2, 2011 meeting and he admits that reasonable suspicion existed at that time.  Plaintiff does not argue that officers needed a valid warrant to take him into custody on December 6, 2011, so long as they had reasonable suspicion that he had violated the terms of his supervision.  Thus, there was no Fourth Amendment violation, regardless whether the authority to arrest existed when defendant Reynolds issued the apprehension request.

Another way of looking at the issue is that plaintiff suffered no harm from any decision made on November 23, 2011 to take him into custody because he would have been

taken into custody on December 6, 2011, whether or not Reynolds issued the earlier apprehension request. At the least, defendant Reynolds is entitled to qualified immunity because plaintiff does not cite any clearly established law suggesting that Reynolds was required to withdraw his November 23, 2011 apprehension request and issue a new one after plaintiff missed the December 2, 2011 visit. Carroll v. Carman, 135 S. Ct. 348, 350 (2014) ("A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.").

## B. Focused Deterrence Program

In 2011, the Madison Police Department implemented its "Focused Deterrence" program to "deter[] crimes committed by repeat violent offenders" because "such offenders are responsible for a disproportionate percentage of crime in Madison" and they "require more law enforcement and community resources than other offenders." Dfts.' PFOF ¶¶ 12-13, 34, dkt. #119. By focusing on repeat violent offenders, the department believed that "violent crime and recidivism would be reduced, fewer arrests would be made, fewer calls for services would be received and [police] and community resources would be conserved." Id. at ¶ 14. In summarizing the program, defendants say that it "identifies those individuals who are responsible for creating a disproportionate amount of crime and victims and focuses law enforcement and community resources on them. At the same time, law enforcement agencies commit to seeking swift and aggressive punishment by the criminal justice system

if these individuals reoffend." Id. at ¶ 17.  When deciding whether to place an individual in the Focused Deterrence program, officials consider the following criteria: the severity and immediacy of the threat to public safety posed by the individual; the individual's overall impact on the community; the number, frequency and recency of offenses; the amount of police resources that have been dedicated to the individual; reason to believe the individual is actively offending; and the individual's overall criminal history.  Id. at ¶ 39.

In 2011, officers followed a seven-step process before placing an individual in the program.  First, the Wisconsin Department of Corrections provided a list of "the most violent offenders" released into the community within the last year.  Id. at 41. Second, the police department's technology staff searched the computer system "to retrieve data on the most prolific violent offenders."  Id. at ¶ 42.  The following offenses were "particularly emphasized": homicide, arson, assault, domestic abuse, kidnapping, physical abuse of a child, sexual assaults, stalking, robbery and weapon offenses.  Id.

Third, after analyzing the two lists and identifying a "top tier" of candidates, the police department conducted criminal history checks and "intelligence gathering" on the identified candidates.  Id. at. ¶ 43.  Fourth, the names of identified candidates were disseminated throughout the police department and other law enforcement agencies for "additional intelligence and information sharing."  In addition, the department "consulted with prosecutors and [the Department of Corrections] regarding the individuals on the list. Id. at 44.  Fifth, after receiving intelligence from other law enforcement agencies, the police department reviewed and evaluated the candidates and determined which individuals could

7

be designated "targets." Id. at ¶ 45.

Sixth, the police department provided a "target list" to the department's crime analysts for assistance in "identifying criminal trends and patterns." Id. at ¶ 46. Finally, after detectives received a "Target Case File" and an investigative strategies checklist, the police department developed a "response plan" for the targeted individuals. Id. at ¶ 47. The police department distributed the list of targeted individuals throughout the department and gave the list to the Madison City Attorney, Dane County District Attorney and United States Attorney. Id. at ¶¶ 48-49.

The next phase of the process is a "Notification Call-in." Id. at ¶ 52. After potential candidates were identified, they were "subject to a separate and independent selection process." Id. at ¶ 53. The "Notification Selection Committee" made the final decision regarding which individuals would be notified. Id. at ¶ 54. "There are no specific criteria that any individual offender must satisfy to qualify for Notification. Rather, the Committee considers the offender's overall criminal history and whether the candidate and community would benefit from Notification." Id. at ¶ 65. Individuals notified were "subject to increased scrutiny by law enforcement and, if they commit[ted] additional criminal offenses, they [would] be subject to maximum penalties." Id. at ¶ 67.

After an individual is notified, his name is disseminated to various department units and other law enforcement agencies. Id. at ¶ 74. If a notified individual is arrested on new charges, the police department "may communicate directly with the D.A.'s office or U.S. Attorney's Office in order to expedite an aggressive prosecution." Id. at ¶ 77. However, the

department cannot require probation officers to seek revocation if an individual in the program violates the conditions of his probation. Similarly, law enforcement officers, district attorneys, administrative law judges and other officials involved in the criminal justice system retain all the discretion granted to them under the law. Id. at ¶ 81.

In 2011, plaintiff was identified by the police department as a repeat violent offender. Id. at ¶ 88. (Neither side says whether officials followed the seven-step process outlined above.) The department created a "candidate summary" about plaintiff, using information obtained from Wisconsin's online judicial records, criminal complaints, DOC records and Crime Information Bureau records. Id. at ¶ 91. The summary showed that plaintiff had: (1) 39 contacts with various police departments between October 17, 1990, and July 26, 2011; (2) nine felony convictions, including three counts of child abuse from 2009; (3) 17 misdemeanor convictions, including multiple convictions for battery; and (4) 33 criminal charges and 79 charged offenses, including multiple incidents of battery, child abuse, eluding and resisting an officer, disorderly conduct and threats. Id. at ¶¶ 92-94.

At the time plaintiff was considered for "notification," he was on community supervision imposed in three Dane County criminal cases: 09-CF-1694, 09-CF-1695 and 09-CM-2707. In case 09-CF-1694, plaintiff had been convicted of child abuse—intentionally causing harm. In case 09-CF-1695, he had been convicted of battery and criminal damage to property as a repeat offender. In case 09-CM-2707, he had been convicted of battery as a repeat offender. Id. at ¶ 97. In addition, plaintiff had the most charged offenses of any individual chosen for "notification" at that time. Id. at ¶ 103.

1.  Equal protection

The question raised by defendants' summary judgment motion with respect to plaintiff's equal protection claim is whether a reasonable jury could find that plaintiff was placed in the Focused Deterrence program because he is an African American.  Washington v. Davis, 426 U.S. 229 (1976) (equal protection claim requires showing of discriminatory intent). The strongest evidence in plaintiff's favor is statistical.  Of the 64 individuals placed in the program, 55 of them are black.  Dfts.' PFOF ¶ 85, dkt. #119.   When compared to the small number of African Americans in the city of Madison (less than 5 percent of the total population, dkt. #111-9 at 5), that is a striking figure.  Further, a cursory look at plaintiff's convictions might raise questions about why he was placed in the program. Although plaintiff has been convicted of several violent crimes such as child abuse and domestic violence, it seems unlikely that his convictions would qualify him as one of "the most violent offenders" in the city.

Unfortunately for plaintiff, however, statistics and a small number of violent convictions are not enough to allow a reasonable jury to find that defendants placed plaintiff in the "Focused Deterrence" program because of his race.  With respect to statistics, these show a disparate *impact*, but they are only one small part of proving discriminatory *intent*. A plaintiff relying on statistical evidence must still adduce specific evidence showing that the defendants discriminated against *him* in particular.  Baylie v. Federal Reserve Bank of Chicago, 476 F.3d 522, 524 (7th Cir. 2007) ("Statistical analysis is relevant . . . [but] it must be coupled with other evidence, which does most of the work."); Nichols v. Southern

Illinois University-Edwardsville, 510 F.3d 772, 782 (7th Cir. 2007) ("[A] plaintiff may use pattern evidence of disparate treatment even if that evidence is not rigorously statistical, although, standing alone, it is insufficient evidence to withstand summary judgment"). Accord Matthews v. Waukesha County, 759 F.3d 821, 829-30 (7th Cir. 2014); Norman-Nunnery v. Madison Area Technical College, 625 F.3d 422, 431 (7th Cir. 2010); Barricks v. Eli Lilly & Co., 481 F.3d 556, 559 (7th Cir. 2007).

With respect to plaintiff's criminal history, defendants say that they considered not just plaintiff's convictions, but also all of his arrests, which include dozens more charges (79 in total), including some for violent offenses. Dfts.' PFOF ¶¶ 93-94, dkt. #119. It may seem unfair for defendants to consider offenses for which plaintiff was never convicted, but that decision is not *discriminatory* unless defendants were treating plaintiff differently from other, similarly situated individuals. City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (equal protection clause requires that "all persons similarly situated should be treated alike"). Plaintiff has not made that showing. In fact, it is undisputed that, as a general matter, the police department considered "an individual's charged offenses as well as his or her convictions in deciding upon potential candidates for Notification." Dfts.' PFOF ¶ 58, dkt. #119.

Neither side compares plaintiff's criminal history with the criminal histories of the other individuals included in the program or individuals excluded from the program. Also missing from the parties' summary judgment materials is a detailed explanation regarding the process defendants used to choose plaintiff in particular for the program. That evidence

would have been useful in evaluating whether defendants treated plaintiff equally to similarly situated individuals.  However, it is plaintiff's burden to prove his claim; it is not defendants' burden to disprove it.  Wade v. Collier, 783 F.3d 1081, 1088-89 (7th Cir. 2015) ("[I]t is [the plaintiff] and not the defendants who bears the burden of proof and to survive summary judgment, [the plaintiff] must identify an individual who was similarly situated but treated differently, without a rational reason."); Bass v. Joliet Public School District No. 86, 746 F.3d 835, 841 (7th Cir. 2014) ("It is [the plaintiff], the party with the burden of proof, who must present some evidence that would allow a rational jury to infer intentional discrimination by the [defendant].").  Thus, the lack of argument on this issue does not help plaintiff.  Further, the little evidence presented cuts against him.  It is undisputed that plaintiff had more charged offenses than anyone else who received a "notification" at the same time he did.  Dfts.' PFOF ¶ 103, dkt. #119.

Plaintiff points to other evidence in an attempt to support his claim, but it is not helpful.  First, plaintiff points to evidence that African Americans are much more likely than Caucasians to be arrested and incarcerated in Madison.  Dkt. #111-9 at 5.  Again, statistical evidence alone cannot prove discriminatory intent.  Even if it could, statistics regarding arrest rates would not be probative of discrimination in this case unless plaintiff showed that *defendants* in particular were responsible for unfair arrests and incarcerations. Defendants cannot be held liable simply for relying on plaintiff's or another individual's criminal history record when making decisions regarding the Focused Deterrence program, even if defendants knew that statistics showed a disparate impact.  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009)

12

("[E]ach Government official . . . is only liable for his or her own misconduct. . . [P]urpose rather than knowledge is required to impose . . . liability . . . for unconstitutional discrimination."); id. at 676-77 ("[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences.  It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group.") (internal quotations, citations and alterations omitted). Because plaintiff does not tie any of the arrest statistics to decisions made by defendants, that evidence is not helpful.

Second, plaintiff cites testimony from defendant Nelson, in which Nelson admits that he had been "chasing [plaintiff] around the south side back in the '90s."  Dkt. #112-1 at 24. Plaintiff says this testimony shows that defendants had a "long history of pursuing" plaintiff, Plt.'s Br., dkt. #108, at 17, but even if that is true, it is not relevant unless defendants were pursuing plaintiff because of his race rather than because of his criminal conduct.  Plaintiff does not cite any evidence suggesting that defendant Nelson had a discriminatory motive, so Nelson's comment does not provide any support for plaintiff's claim.

In the absence of evidence of discriminatory intent, plaintiff cannot prevail on his equal protection claim.  Accordingly, I am granting defendants' summary judgment motion as to this claim.

2. <u>Due process</u>

The due process clause requires the state to provide notice and an opportunity to be heard before depriving an individual of certain types of liberty or property.  For example, public officials may violate an individual's right to due process if they injure his reputation and alter his legal status without giving him an opportunity to clear his name.  <u>Mann v. Vogel</u>, 707 F.3d 872, 878 (7th Cir. 2013).  In this case, plaintiff says that defendants harmed his reputation by labeling him one of the city's "most violent offenders" and altered his legal status by placing him in the Focused Deterrence program, so he should have been given an opportunity to object to his placement in the program.  In their opening brief, defendants do not discuss whether they injured plaintiff's reputation by placing him in the program, so I will limit my consideration to whether plaintiff's placement eliminated or altered a legal right or status.

Plaintiff says that his placement in the Focused Deterrence program changed his legal status because it was akin to a "retroactive condition of his probation," Plt.'s Br., dkt, #108, at 9, but I do not see how that is so.  Plaintiff does not identify any new restrictions that defendants placed on his conduct as a result of his placement in the program or any new punishments that he could not have received even before his placement in the program.  Even if I assume that plaintiff's probation agent monitored plaintiff's conduct more closely and was more likely to seek revocation as a result of the program, these are discretionary decisions that the agent could have made even without the existence of the program.

Plaintiff cites <u>Domka v. Portage County, Wisconsin</u>, 523 F.3d 776, 780-81 (7th Cir.

14

2008), and Schepers v. Commissioner, Indiana Dept, of Correction, 691 F.3d 909, 911 (7th Cir. 2012), to support his claim.  Although I cited Schepers in the order screening plaintiff's complaint as possibly relevant authority, the undisputed facts on summary judgment show now that neither Schepers nor Domka are instructive.

In Schepers, 691 F.3d 699, the court of appeals concluded that individuals were entitled to notice and an opportunity to be heard before being required to register as sex offenders.  There is some similarity between this case and Schepers because both cases involve a person being labeled as dangerous.  However, the important difference is that the registry in Schepers, 691 F.3d at 14, subjected the plaintiffs to additional limitations on their liberty, in the form of reporting requirements and restrictions on where they could live. Again, plaintiff has not identified any new restrictions on his liberty imposed on him as a result of his placement in the Focused Deterrence program.  Rather, the Focused Deterrence program involves changes in the way public officials respond to an individual's misconduct.

In Domka, 523 F.3d 776, the court considered whether an individual is entitled to process before he is transferred from home detention to jail and before his work release privileges are revoked.  The court did not answer that question because it concluded that the plaintiff had waived his right to due process.  Id. at 780-81.  However, even if I assume that due process applies in that context, it does not help plaintiff because the decision at issue in Domka placed greater restrictions on the individual's liberty.

In sum, I conclude that defendants are entitled to summary judgment on plaintiff's due process claim because plaintiff has not shown that defendants altered plaintiff's legal

rights or status in a manner that deprived him of liberty.

ORDER

IT IS ORDERED that the motions for summary judgment filed by defendant Bryan Reynolds, dkt. #95, and defendants Noble Wray, Tom Woodmansee, Cory Nelson, Samantha Kellogg, Paige Valenta and the City of Madison, dkt. #100, are GRANTED. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 16th day of December, 2015.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge